# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

KENNETH RAY SYLER,     *

       Plaintiff,     *

vs.     *     CIVIL ACTION NO. 12-00730-B

CAROLYN W. COLVIN,[1]     *
Commissioner of Social Security,     *

       Defendant.     *

## ORDER

Plaintiff Kenneth Ray Syler (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* On November 1, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 19). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. A hearing was conducted in this matter on November 1, 2013, before the undersigned Magistrate Judge. (Doc. 20). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), <u>Federal Rules of Civil Procedure</u>, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.    Procedural History

Plaintiff filed an application for disability insurance benefits on October 21, 2009, and alleged that his disability commenced on September 20, 2009.  (Tr. 155, 163).  Plaintiff's application was denied at the initial stage on February 22, 2010.  (Id. at 81).  He filed a timely Request for Hearing, and on May 11, 2011, Administrative Law Judge Linda J. Helm (hereinafter "ALJ") held an administrative hearing, which was attended by Plaintiff, who provided testimony, and Plaintiff's attorney.  (Id. at 37).  A vocational expert ("VE") also appeared at the hearing and provided testimony.  (Id. at 69).  On June 2, 2011, the ALJ issued an unfavorable opinion finding that Plaintiff is not disabled.  (Id. at 33).  The Appeals Council denied Plaintiff's request for review on November 7, 2012.  (Id. at 1).  Thus, the ALJ's decision dated June 2, 2011, became the final decision of the Commissioner.  Having exhausted his administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

# II.    Issues on Appeal

A.    Whether the ALJ erred in determining that Plaintiff did not meet or equal Listing 12.05?

B.    Whether the ALJ erred in failing to properly evaluate Plaintiff's complaints of pain and in failing to consider all of the evidence of record?

C.    Whether the ALJ erred in failing to properly consider all the claimant's impairments and resulting limitations in posing a hypothetical to the Vocational Expert?

# III.    Factual Background

Plaintiff was born on May 2, 1963, and was forty-eight years of age at the time of his administrative hearing.  (Tr. 43).  Plaintiff began, but did not complete, the ninth grade and was

in special education classes.  (Id. at 45).  He testified that he can read and write "some" and agreed that he can "function as [he] need[s] to."  (Id. at 45-46).

According to Plaintiff, he injured his ankle on September 20, 2009, when he fell from a roof while helping some friends work on their house.  (Id. at 47).  Plaintiff testified that his ankle was broken in six places, that his leg was broken in two places, and that his ankle still swells and hurts every time he moves it.  (Id. at 53).  Plaintiff also testified that, before his injury in 2009, he had not worked for three years because it was difficult to find work.  (Id. at 47-48).  Prior to 2006, Plaintiff had worked in industrial construction, hanging iron and pouring concrete.  (Id. at 48-49).

Plaintiff contends that he cannot work now because of pain in his ankle, which he described as about a five out of ten on the pain scale when he is sitting and about a ten out of ten when he walks on it "a lot."  (Id. at 53-54).  At the time of the hearing, Plaintiff reported taking Lortab for pain once or twice a week, whenever he could get it.  (Id. at 53-54).  Plaintiff also testified that he uses a cane and that he is able to help his mother with household chores, mow the grass with a riding lawnmower, work on his vehicles, take care of his dogs, and fish.  (Id. at 55, 59-60).

IV.  **Analysis**

A.  **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[2]  Martin v.

_____

[2] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

B.      **Discussion**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[3] 20 C.F.R.

_____

[3] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In

§§ 404.1520, 416.920.

### 1. ALJ's Decision

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since September 20, 2009, the alleged onset date, and that that he has the severe impairments of history of right ankle fracture and borderline intellectual functioning. (Tr. at 23). The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.).

The ALJ concluded that Plaintiff is precluded from performing any of his past relevant work. (Id. at 31). However, he retains the residual functional capacity (hereinafter "RFC") to perform a range of sedentary work, with the following restrictions: Plaintiff can lift and carry up to ten pounds; he can stand and/or walk for no more than fifteen minutes at a time and no more than two hours in an eight-hour workday; he can sit for six hours in an eight-hour workday; he is unable to operate foot controls with the right foot; he is limited to no more than occasionally climbing stairs and ramps; he is unable to climb ladders, scaffolds, and ropes; he is unable to work around unprotected heights or dangerous equipment or operate a commercial vehicle; he is unable to understand, remember, and carry out complex or detailed job instructions, but can

---

evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

understand, remember, and carry out short, simple, one or two step job instructions; and he is limited to jobs with no more than occasional changes in the work setting and routines. (Id. at 25). The ALJ found that given Plaintiff's RFC for a range of sedentary work, as well as his age, education, work experience, and the testimony of the VE, he can perform the requirements of representative occupations such as "brake lining coater" (DOT #574.685-010), "eyeglass frame polisher" (DOT #713.684-038), and "printed circuit layout taper" (DOT #017.684-010). (Id. at 32-33). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

## 2. Record Evidence

### a. Academic Evidence

In 1978, at the age of eleven, Plaintiff was tested using the Weschsler Intelligence Scale for Children (WISC-R) and obtained a Verbal IQ score of 70, a Performance IQ score of 88, and a Full Scale IQ score of 78 (borderline range). (Id. at 226). As a result of the testing, it was determined that Plaintiff was functioning in the "borderline range of measured intelligence" and that he had weakness in understanding simple associations and relationships, arithmetic skills, verbal fluency and language development, retention and auditory memory, and visual organization of designs and psychomotor ability (dexterity). (Id. at 227). Plaintiff's strengths were listed as "alertness in visual observation and the ability to organize spatial relationships in problem solving (puzzles)." (Id.). It was recommended that further investigation be made into possible verbal learning dysfunction and learning disability classes. (Id.).

### b. Medical Evidence

The relevant medical evidence in this case reflects that on September 20, 2009, Plaintiff was treated at the emergency room at Providence Hospital after slipping off of a roof and landing on his ankle while helping friends work on a house. (Id. at 47, 238-39). X-rays showed fractures

of the right distal tibia and fibula, requiring surgery to attach an external fixator frame to Plaintiff's right ankle. (Id. at 249, 251-52, 260).

On October 1, 2009, Plaintiff returned to Providence Hospital for a follow up examination and was treated by Dr. Tim Revels. (Id. at 235). Dr. Revels ordered a CT scan of the right tibia and fibula which showed: "[c]omminuted intraarticular fracture of the distal tibia with comminuted fracture distal fibular diaphysis. . . . External fixating device present." (Id. at 237).

Dr. Revels referred Plaintiff to Dr. Frederick Meyer at the USA Stanton Road Clinic. (Id. at 260). Dr. Meyer's notes from November 2, 2009 reflect that Plaintiff had a deltoid frame external fixator attached to his right lower extremity and that the pins were clean, dry, and in tact, with no signs of infection. (Id.). Dr. Meyer also noted that Plaintiff had significant swelling but was in no acute distress. (Id.). Dr. Meyer referred Plaintiff to the financial administrator to seek approval for open reduction and internal fixation surgery. (Id. at 261). Dr. Meyer prescribed Lortab and instructed Plaintiff to keep his foot elevated and return in two weeks. (Id.).

Plaintiff returned to Dr. Meyer on November 16, 2009, and Dr. Meyer's treatment notes reflect that Plaintiff was continuing to seek financial assistance for open reduction and internal fixation surgery. (Id. at 258). Plaintiff reported to Dr. Meyer that the pain in his right foot was "10/10," and he requested increased pain medication. (Id.). Dr. Meyer examined Plaintiff and noted no signs of infection but significant swelling of the foot and ankle region. (Id.). Dr. Meyer prescribed oxycodone and instructed Plaintiff to keep his foot elevated. (Id.).

On November 30, 2009, Dr. Meyer's treatment notes reflect that, at two months post-injury, Plaintiff had not improved and had drainage and significant swelling at that time. (Id. at

256). Dr. Meyer's plan was to "discuss the patient with Dr. [Mark] Perry and also work on getting financial approval for an open reduction and internal fixation." (Id.). X-rays taken on that date show "[h]ealing tibial and fibular comminuted fractures. Worsening disuse osteopenia." (Id. at 264).

On December 2, 2009, ten weeks after his ankle injury, Plaintiff saw Dr. Mark Perry, an orthopedist, who noted no evidence of infection or cellulitis. (Id. at 290). After reviewing Plaintiff's x-rays, Dr. Perry removed the fixator and placed Plaintiff in a short leg walking cast. (Id.). Dr. Perry noted that "there is a significant probability that in the future Mr. Syler may need a fusion, which would make the 'shin bone and ankle bone become one' in order to ultimately treat his rather devastating right leg injury." (Id.).

Plaintiff returned to Dr. Perry on December 8, 2009. The treatment notes reflect that no sign of infection was observed on Plaintiff's ankle, but there was some swelling. (Id. at 289). Dr. Perry removed the cast from Plaintiff's ankle and replaced it with a boot. (Id.). He also discussed with Plaintiff the financial considerations of surgery. (Id.).

On December 23, 2009, during Plaintiff's follow up examination with Dr. Perry, and Dr. Perry noted that x-rays showed that the "limb appeared to be nicely aligned." (Id. at 288). Dr. Perry further noted significant swelling around Plaintiff's foot and instructed him to begin weight bearing exercises in physical therapy at approximately 20%. (Id.). Dr. Perry also noted that after consulting with another physician in the clinic, he and the other physician "concur[red] with nonoperative treatment at this time." (Id.). Plaintiff reported that he had put small amounts of weight on his foot and that it "hurts all over." (Id) Dr. Perry prescribed pain medication and instructed Plaintiff to return in three weeks. (Id.).

The record shows that on January 6, 2010, State Agency psychologist Dr. Ellen Eno,

Ph.D., reviewed Plaintiff's medical records and completed a Psychiatric Review Technique. She opined that Plaintiff has a "borderline IQ," resulting in "mild" difficulties in activities of daily living and maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Id. at 266-67, 276). Dr. Eno also completed a Mental RFC Assessment wherein she opined that Plaintiff is "moderately" limited in four functional areas (ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to respond appropriately to changes in the work setting). (Id. at 280-81). She found that Plaintiff is "not significantly limited" in the remaining sixteen functional areas. (Id. at 281). Dr. Eno concluded that Plaintiff "has the ability understand, recall and carry out short, simple instructions and to attend to such tasks for two hour intervals," although "[c]hanges in the work routine should be infrequent." (Id. at 282). Dr. Eno found no significant limitations with respect to social interaction. (Id.).

On January 13, 2010, Plaintiff had a follow up visit with Dr. Perry who noted that Plaintiff had decreased swelling compared to previous examinations. (Id. at 287). Dr. Perry reviewed x-rays and noted that "the joint alignment is good." Dr. Perry advised Plaintiff to continue to take Lortab for pain, and instructed him to increase his weight bearing exercises at physical therapy to 30% and to return in three weeks. (Id.).

Dr. Perry's treatment notes dated February 3, 2010 reflect that Plaintiff was ambulating in a boot with no assistive devices. (Id. at 286). Plaintiff reported that things had been "going well for him" although he did have some "swelling and discomfort." (Id. at 286). Dr. Perry noted that the tenderness that Plaintiff was experiencing was due to "disuse" and that he was "ambulating well in the boot." (Id.). Dr. Perry increased the amount of weight bearing at

physical therapy from 30% to "as tolerated" and continued Plaintiff on Lortab for pain.  (Id.).

During Plaintiff's February 24, 2010 visit with Dr. Perry, Dr. Perry noted that Plaintiff had been undergoing physical therapy and was "doing very well." (Id. at 299).  Plaintiff reported that "he gets around the house without his [boot] with no significant discomfort." (Id.).  Upon examination, Dr. Perry noted that Plaintiff had increased range of motion in his ankle, that his sensation was intact, that he had no pain around the joint line, but that he had some tenderness under his heel and possible plantar fibromatosis in the arch of his foot. (Id.).  Dr. Perry instructed Plaintiff to continue physical therapy, to increase the weight bearing on his foot out of the boot, and to wear a "cutout" for his heel and arch.  (Id.).

Dr. Perry's treatment notes dated March 24, 2010 includes a report from Plaintiff's physical therapist stating that Plaintiff is "making progress." (Id. at 297).  Dr. Perry noted, however, that Plaintiff had recently stepped in a hole and twisted his right ankle, and as a result, physical therapy had been put on hold. (Id.).  Dr. Perry further noted some swelling and tenderness which he attributed to the recent injury. (Id.).  Dr. Perry also noted that Plaintiff had no problem with his range of motion, and his sensation was in tact. (Id.).  X-rays taken on that date showed that the fractures were "[h]ealing" and that Plaintiff had "[d]isuse osteoporosis." (Id. at 298).  Dr. Perry instructed Plaintiff to continue physical therapy, to take over-the-counter Naprosyn as needed, and to return in three weeks. (Id.  at 297).

During Plaintiff's April 13, 2010 visit, Plaintiff reported to Dr. Perry that he was "do[ing] some work," although he had difficulty as a result of his injury. (Id. at 296).  Dr. Perry noted that "[a]ctively and passively [Plaintiff] ha[d] good range of motion of his ankle" but that his gait was "somewhat hesitant," and he "tend[ed] to use his foot as a pedestal." (Id.).  At the request of Plaintiff's attorney, Dr. Perry completed disability forms.  On the form, Dr. Perry opined that

while Plaintiff may not be able to perform heavy manual labor "[a]t this point," he "can do sedentary activities[,] [and] [i]n the future, he may be able to resume activities, which require more of a physical demand." (Id.). Dr. Perry continued to prescribe Lortab and instructed Plaintiff to return in two months. (Id.).

On that same date, April 13, 2010, Dr. Perry completed a Physical Capacities Evaluation form, in which he opined that Plaintiff can sit for three hours at one time for a total of more than six hours a day, that he can stand and/or walk for less than two hours per day, that his ability to lift, carry, climb, balance, stoop, kneel, crouch, and crawl is "negligible," that he cannot work in high places or drive automotive equipment, but that he can continuously reach overhead, handle, finger, and push/pull with both arms and both legs. (Id. at 292). Dr. Perry commented that Plaintiff's right leg fracture and pain are significant; however, Plaintiff can perform "sustained work activity" for "eight" hours a day if "sitting." (Id.).

Dr. Perry also completed a Clinical Assessment of Pain form. He opined that Plaintiff's pain intensity is "moderate," meaning that it results in extensive diminution of his capacity to carry out specific activities of daily living and requires frequent use of narcotic medication and possibly invasive procedures. (Id. at 291). In addition, Dr. Perry opined that physical activity increases Plaintiff's pain intensity to the extent that medication or bed rest is necessary and that his medication impacts his work ability to the extent that his effectiveness is severely limited in the work place due to distraction, inattention, and drowsiness. (Id.). Dr. Perry also opined that he anticipates improvement in Plaintiff's condition; however, he predicted significant impairment for at least one year from the date of the injury and stated that it was doubtful that Plaintiff would return to heavy manual labor. (Id.).

On June 15, 2010, Plaintiff returned to Dr. Perry for a follow up examination. Dr. Perry

noted that Plaintiff had "range of motion, which is quite nice with regards to dorsiflexion." Plaintiff reported that he was still unable to ambulate long distances or stand for prolonged periods of time, and that "all he is able to do is fish." (Id. at 295). Dr. Perry noted that Plaintiff was "well tanned and [had] no evidence of malignant degeneration around his incisions." (Id.). Dr. Perry prescribed Lortab and instructed Plaintiff to return in two months. (Id.).

During Plaintiff's visit to Dr. Perry on August 17, 2010, Plaintiff complained that he still had pain in his left ankle that tended to be positional when he turned it "a certain way." (Id. at 294). Dr. Perry noted no sign of infection or cellulitis and observed that x-rays showed "relative lengthening of the lateral malleolus." (Id.). Dr. Perry discussed with Plaintiff the possibility of fibular shortening, as well as the fact that it would take approximately six weeks of recovery and that it would be beneficial if Plaintiff would stop smoking. (Id.). Plaintiff questioned whether he needed the surgery based upon his symptoms. (Id.). Dr. Perry refilled Plaintiff's Lortab prescription and instructed Plaintiff to contact the office if he decided upon surgical intervention. (Id.). This is the final treatment note in the record. At the time of the administrative hearing on May 11, 2011, Plaintiff had not sought further medical treatment. (Id. at 37, 42, 294).

### 3. Issues

#### a. Whether the ALJ erred in determining that Plaintiff did not meet or equal Listing 12.05?

In his brief, Plaintiff argues that the ALJ erred in determining that Plaintiff does not meet or equal Listing 12.05 (mental retardation) because he satisfied the criteria of § 12.05C by having a valid Verbal IQ score of 70 and a physical impairment that imposes additional and significant work-related limitation of function. (Doc. 13 at 2-10). The Government maintains, however, that the ALJ properly found that Plaintiff's mental impairments do not meet or medically equal Listing 12.05 because Plaintiff has not shown that he has deficits in adaptive

functioning, which is required in order to meet Listing 12.05C. (Doc 17 at 7-9).

As discussed above, the Social Security regulations set forth a five-step sequential evaluation process to determine whether a claimant is disabled. At step three, the claimant has the burden of proving that an impairment meets or equals a listed impairment. See Harris v. Commissioner of Soc. Sec., 330 Fed. Appx. 813, 815 (11th Cir. 2009) (unpublished)[4] (citing Barron v. Sullivan, 924 F.2d 227, 229 (11th Cir. 1991)). Listing 12.05 (the listing category for mental retardation/intellectual disability)[5] begins with an introductory paragraph which states that mental retardation "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.05. The Eleventh Circuit has determined that, to be considered for disability benefits under Listing 12.05, "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997). This court has held that "[a] low IQ score, standing alone, is insufficient to satisfy Listing 12.05's introductory paragraph; evidence must also demonstrate deficits in

---

[4] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11TH CIR. R. 36-2.

[5] On August 1, 2013, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." See Hickel v. Commissioner of Soc. Sec., 2013 U.S. App. LEXIS 21951, *3 n.2, 2013 WL 5778956, *8 n.2 (11th Cir. 2013) (citing 78 Fed. Reg. 46,499, 46,501, to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1)). "This change was made because the term 'mental retardation' has negative connotations, and has become offensive to many people. Id. (citations and internal quotation marks omitted). "The Social Security Administration stated that the change does not affect the actual medical definition of the disorder or available programs or services." Id. (citations and internal quotation marks omitted). As in Hickel, this opinion uses the term "mental retardation" and "intellectual disability" interchangeably.

adaptive functioning, with an onset prior to age 22." Bennett v. Colvin, 2013 U.S. Dist. LEXIS 117700, *47, 2013 WL 4479129, *16 (S.D. Ala. 2013) (citations omitted). "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Bennett, 2013 U.S. Dist. LEXIS 117700 at *48, 2013 WL 4479129 at *16 (citing American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR) ("Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation.")). "If a claimant does not have *current* deficits in adaptive functioning, he will not meet Listing 12.05." Convery v. Commissioner of Soc. Sec., 2012 U.S. Dist. LEXIS 2390, *15, 2012 WL 39540, *5 (M.D. Fla. 2012) (emphasis added).

In addition to satisfying the requirements of the diagnostic description in the introductory paragraph, a claimant must also meet one of the four sets of criteria described in paragraphs A through D in order to be found disabled under Listing 12.05. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00A. Section 12.00A states in pertinent part:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability [mental retardation]. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00A (emphasis added); see also Harris, 330 Fed. Appx. at 815 ("[t]he impairment must satisfy the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria described in section 12.05 to meet the listing requirements.") (emphasis added).

Taken together, a claimant proceeding under § 12.05C must satisfy three criteria: "1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22 [*i.e.*, the diagnostic description criteria]; 2) a valid verbal, performance, or full scale IQ score of 60 to 70; and 3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." Jones v. Astrue, 2012 U.S. Dist. LEXIS 153141, *9, 2012 WL 5305142, *3 (M.D. Ala. 2012). If a claimant establishes a valid IQ score between 60-70, there is a "rebuttable presumption" that he or she "manifested deficits in adaptive functioning before the age of 22." Grant v. Astrue, 255 Fed. Appx. 374, 375 (11th Cir. 2007) (unpublished). Even so, the claimant must still show under the final prong of 12.05C that he or she has "a severe impairment that significantly limits the applicant's 'physical or mental ability to do basic work activities.'" Harris, 330 Fed. Appx. at 815 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A)) (requiring plaintiff to show "evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities.").

In the event that a claimant satisfies the requirements of Listing 12.05C, the defendant still has the opportunity to rebut the presumption of disability by presenting evidence of plaintiff's activities of daily life that show that he or she does not suffer from the deficits in adaptive functioning required for mental retardation. Bennett, 2013 U.S. Dist. LEXIS 117700 at *46, 2013 WL 4479129 at *16. As discussed above, I.Q. test results alone are not dispositive and "must be consistent with a plaintiff's daily activities and behavior." Id. at *47 (citations omitted). Indeed, "[a]lthough a rebuttable presumption exists as to a plaintiff's IQ score remaining relatively constant throughout life, see Hodges v. Barnhart, 276 F.3d 1265, 1286–69 (11th Cir. 2001), if a claimant does not have *current* deficits in adaptive functioning, he will not

meet Listing 12.05." <u>Convery</u>, 2012 U.S. Dist. LEXIS 2390 at *16, 2012 WL 39540 at *5 (emphasis added) (holding that where plaintiff had maintained employment, had been married, was able to live independently, performed housework, paid bills, socialized with friends, owned a business, performed semi-skilled work, was able to use a computer, shopped, cooked meals, and took care of his personal needs, his daily activities and behavior demonstrated that he did not have deficits in adaptive functioning, and thus, he did not meet Listing 12.05C) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A; and <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) ("[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.")).

In her decision in this case, the ALJ discussed Listing 12.05 and found that Plaintiff failed to meet the threshold requirements of the Listing because he did not show deficits in adaptive functioning, as required by the introductory paragraph of the Listing 12.05. The ALJ stated:

> Mental retardation [under § 12.05] refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> "To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age 22." <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997). Although intelligence testing revealed that the claimant has a Verbal IQ score of 70, he was diagnosed with borderline intellectual functioning, not mental retardation. Additionally, the claimant does not have deficits in adaptive functioning required by Medical Listing 12.05. He is able to care for his personal needs, care for pets, mow the grass, and work on vehicles (Hearing Testimony). He is able to pay bills and count change (Exhibit 3E). Moreover, he worked for many years prior to the alleged onset of disability and some of the claimant's past relevant work is

classified as semi-skilled as discussed in more detail below. The claimant's ability to care for his personal needs and perform a variety of daily activities along with his work history shows that he does not have the requisite deficits in adaptive functioning.

Because the borderline intellectual functioning does not meet the requirement of the introductory paragraph with the diagnostic description for mental retardation, this condition does not meet Medical Listing 12.05 regardless of whether the requirements in paragraphs A, B, C or D are satisfied.

(Tr. at 24).

As set forth above, the ALJ essentially found that that while Plaintiff had a verbal IQ score of 70, it was not valid based on Plaintiff's diagnosis of borderline intellectual functioning, the evidence of Plaintiff's activities of daily living, and Plaintiff's semi-skilled work history. Thus, the ALJ determined that because Plaintiff does not have the requisite deficits in adaptive functioning required by the introductory paragraph of Listing 12.05, he does not meet the Listing of 12.05. The Court agrees.

As the case law discussed demonstrates, absent current deficits in adaptive functioning, Plaintiff cannot meet Listing 12.05. See, e.g., Convery, 2012 U.S. Dist. LEXIS 2390 at *16, 2012 WL 39540 at *5 ("if a claimant does not have current deficits in adaptive functioning, he will not meet Listing 12.05."). While Plaintiff obtained a Verbal IQ score of 70, he has not been diagnosed as mentally retarded. To the contrary, State Agency psychologist Dr. Eno opined that Plaintiff has a "borderline IQ," resulting in "mild" difficulties in activities of daily living and maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Id. at 267, 276). Dr. Eno further opined that Plaintiff is "moderately" limited in four functional areas (ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to respond appropriately to changes in the work

setting), but "not significantly limited" in the remaining sixteen functional areas. (Id. at 280-81). Specifically, Dr. Eno found that Plaintiff "has the ability understand, recall and carry out short, simple instructions and to attend to such tasks for two hour intervals," although "[c]hanges in the work routine should be infrequent." (Id. at 282).

Furthermore, substantial evidence supports the ALJ's finding that Plaintiff's activities of daily living do not demonstrate the requisite deficits in adaptive functioning. At his administrative hearing on May 11, 2011, Plaintiff testified that although he was in special education classes in school[6] and did not complete the ninth grade, he can read and write "some," and he can "function as [he] need[s] to." (Id. at 45-46). In addition, in his Disability Report, which he completed himself, Plaintiff stated that he can count change and follow written and spoken instructions "as good as necessary." (Id. at 187, 189). He also indicated that the reason that he could not pay bills was because he could not drive to pay them at that time, which was two months after his accident when he was still on crutches. (Id. at 187). Plaintiff indicated at his hearing that he is able to drive but that his driver's license has been suspended for traffic tickets. (Id. at 47, 60). Plaintiff also testified that he lives with his parents, but he owns property about twenty minutes away from his parents' home, which he visits every day. (Id. at 43, 59). He takes care of his personal needs, helps out with chores, mows his property and his parents' property using a riding lawnmower, takes care of his dogs, maintains social relationships, and enjoys leisure activities such as fishing. (Id. at 59-62, 185).

The evidence also shows that prior to his injury in September 2009, Plaintiff was engaged in substantial gainful activity for years, including performing semi-skilled work as a tree cutter (during which time he was self-employed) and as a mechanic. (Id. at 50-51, 70-71). Plaintiff

---

[6] In his Disability Report, Plaintiff stated that he was only in special education classes for reading and math. (Tr. at 181).

testified that he still does mechanic work on his own vehicles. (Id. at 57). There is no allegation that Plaintiff ever quit working due to any mental or cognitive impairment. To the contrary, Plaintiff testified that he did not work for three years prior to his injury because "everything got slow," and his former employer was no longer in business. (Id. at 48). The ALJ properly considered this prior work experience in the context of considering whether Plaintiff met the diagnostic description of Listing 12.05. See Bennett, 2013 U.S. Dist. LEXIS 117700 at *50, 2013 WL 4479129 at *17 ("The DSM explicitly enumerates 'work' as a component of adaptive functioning.") (citations omitted)).

Consequently, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff did not meet the requirements of Listing 12.05. The record establishes that, notwithstanding his IQ score, Plaintiff does not have the current deficits in adaptive functioning required for mental retardation. Therefore, he fails to meet the requirements in the introductory paragraph of Listing 12.05, precluding any finding of disability under § 12.05C. See Monroe v. Astrue, 726 F. Supp. 2d 1349, 1355 (N.D. Fla. 2010) ("in order to meet the criteria of Listing 12.05C, a claimant must not only have a qualifying valid I.Q. score, but must also satisfy the requirements of the introductory paragraph of that Listing") (citing and comparing cases); see also Harris, 330 Fed. Appx. at 815 ("Substantial evidence supports the ALJ's denial of disability benefits because Harris did not meet the requirements of Listing 12.05" where he was "never diagnosed with mental retardation, only borderline intellectual functioning;" he "did well in special education classes and was able to hold several jobs, which did not indicate the type of deficit in adaptive functioning required for mental retardation;" he could dress and bathe himself, take care of his personal needs, and manage money;" and "could read, communicate effectively,

and do simple math.").  Therefore, Plaintiff's claim that the ALJ erred in determining that he did

not meet or equal Listing 12.05 is without merit.

### b. Whether the ALJ erred in failing to properly evaluate Plaintiff's complaints of pain and in failing to consider all of the evidence of record?

Plaintiff argues next that the ALJ erred in failing to properly evaluate his complaints of

pain pursuant to SSR 96-7p[7] and in failing to consider all of the evidence of record.  (Doc. 13

at 10).  The Government counters that the ALJ reasonably evaluated all of the evidence of

record, including Plaintiff's subjective complaints of pain, and identified numerous valid

reasons for discounting Plaintiff's subjective statements.  (Doc. 17 at 9-10).

When evaluating a claim based on disabling subjective symptoms, the ALJ considers

medical findings, a claimant's statements, statements by the treating physician, and evidence of

how the pain affects the claimant's daily activities and ability to work.  20 C.F.R. § 416.929(a).

In a case where a claimant attempts to establish disability through his or her own testimony

concerning pain or other subjective symptoms, a three-part pain standard applies.  That standard

requires: "(1) evidence of an underlying medical condition and either (2) objective medical

evidence that confirms the severity of the alleged pain arising from that condition or (3) that the

---

[7] Plaintiff refers to the following language in SSR 96-7p:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.

SSR 96-7p, 1996 SSR LEXIS 4, * 5-6, 1996 WL 374186, *2.

objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." Hubbard v. Commissioner of Soc. Sec., 348 Fed. Appx. 551, 554 (11th Cir. 2009) (unpublished) (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). The Social Security regulations further provide:

> [S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 C.F.R. 404.1529(a) (2013).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995). Stated differently, "if a claimant testifies to disabling pain and satisfies the three part pain standard, he must be found disabled unless that testimony is properly discredited." Reliford v. Barnhart, 444 F. Supp. 2d 1182, 1186 (N.D. Ala. 2006). Therefore, once the determination has been made that a claimant has satisfied the three-part pain standard, the ALJ must then turn to the question of the credibility of the claimant's subjective complaints. See Reliford, 444 F. Supp. 2d at 1189 n.1 (the pain standard "is designed to be a threshold determination made prior to considering the plaintiff's credibility."). If a claimant does not meet the pain standard, no credibility determination is required. Id.

In assessing a claimant's credibility, the ALJ must consider all of the claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. See 20 C.F.R. §

404.1528. Such credibility determinations are within the province of the ALJ. Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005). However, if an ALJ decides not to credit a claimant's testimony about pain, "the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding." Strickland v. Commissioner of Soc. Sec., 516 Fed. Appx. 829, 832 (11th Cir. 2013) (unpublished) (citing Foote, 67 F.3d at 1562); see also Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court). Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true. Holt, 921 F.2d at 1223.

The Eleventh Circuit has held that the determination of whether objective medical impairments could reasonably be expected to produce the pain is a factual question to be made by the Secretary and, therefore, "subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1985), *vacated on other grounds and reinstated sub nom.,* Hand v. Bowen, 793 F.2d 275 (11th Cir. 1986). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Nye v. Commissioner of Social Sec., 524 Fed. Appx. 538, 543 (11th Cir. 2013) (unpublished).

Relying on the treatment records and objective evidence in this case, the ALJ concluded that Plaintiff's impairment could reasonably be expected to cause some of his symptoms; however, his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Tr. 28-29). Specifically, the ALJ found that Plaintiff's statements related to the disabling nature of his pain from his ankle injury were inconsistent with his treatment records and his own testimony. The Court agrees.

First, as the ALJ found, there is no question that Plaintiff suffered a severe leg injury on September 20, 2009, involving fractures of the right distal tibia and fibula and requiring surgery to attach an external fixator frame to Plaintiff's right ankle.  (Id. at 249, 251-52, 260).  However, Plaintiff's treatment records in the months following his accident show continued, progressive healing of his injury, good reports in physical therapy, and no further treatment after August 2010, less than a year after his initial injury.  (Id. at 264, 286, 294-99).  Indeed, in December 2009, Plaintiff's x-rays showed that the "limb appeared to be nicely aligned," and Dr. Perry recommended "nonoperative treatment at [that] time."  (Id. at 288).  In early February 2010, Dr. Perry noted that Plaintiff was "ambulating well in the boot" with no assistive devices, and Plaintiff reported that things had been "going well for him," although he did have some "swelling and discomfort."  (Id. at 286).  By the end of February 2010, Plaintiff was "doing very well" in physical therapy and "get[ing] around the house without his [boot] with no significant discomfort."  (Id. at 299).  In June 2010, Dr. Perry noted that Plaintiff's range of motion was "quite nice," although Plaintiff reported that he was unable to ambulate long distances or stand for prolonged periods of time.  (Id. at 295).  Plaintiff told Dr. Perry that that "all he is able to do is fish."  (Id.).  The last treatment note in the record is dated August 17, 2010, at which time Plaintiff reported that he still had pain in his left ankle when he turned it "a certain way."  (Id. at 294).  The x-rays showed "relative lengthening of the lateral malleolus," and Dr. Perry discussed with Plaintiff the possibility of fibular shortening; however, Plaintiff declined, stating that he did not know if he needed the surgery at that time based on his symptoms.  (Id.).  Dr. Perry refilled Plaintiff's prescription for Lortab and instructed him to return in two months and to notify the office if he changed his mind about the surgery.  (Id.).  Plaintiff did not do so, and at the time of

his administrative hearing nine months later, he had not sought any further medical treatment for his ankle.  (Id. at 37, 294).

At his hearing, Plaintiff testified that he could not afford medical treatment because he no longer had Medicaid.  (Id. at 52-54).  However, as the ALJ found, there is no evidence that Plaintiff ever sought treatment for his pain at an emergency room or low cost clinic, nor is there any evidence that treatment at a pain clinic was ever recommended.  (Id. at 28).  Also, although Plaintiff testified that he uses a cane to walk (id. at 44, 55), there is no evidence that the cane was prescribed by a physician.

In addition, Plaintiff testified at the hearing that his pain is "about a ten" out of ten on the pain scale "on an average day if [he] walk[s] on it a lot" and about a five out of ten when he is sitting.  (Id. at 54-55).  However, as the ALJ found, Plaintiff's activities of daily living belie his statements regarding the severity of his pain.  The record shows that Plaintiff is able to drive (although he testified that he does not drive because his license is suspended), that he owns property that he visits every day, that he takes care of his own personal needs, that he helps out with chores, that he performs automotive work on his own vehicles, that he mows his property and his parents' property using a riding lawnmower, that he takes care of his dogs, that he maintains social relationships, and that he enjoys leisure activities such as fishing.  (Id. at 55-62, 185).  As the ALJ also noted, Plaintiff had not worked for three years prior to his injury in 2009 (id. at 48), which indicates that his continued unemployment is not solely the result of his disabling pain.

Finally, the Court finds that the ALJ had good cause to discredit Dr. Perry's opinions regarding Plaintiff's limitations as expressed in the April 2010 Physical Capacities Evaluation and Clinical Assessment of Pain forms.  "It is well-established that the testimony of a treating

physician must be given substantial or considerable weight unless good cause is shown to the contrary." Crawford v. Commissioner of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (citations and internal quotations omitted). The ALJ may discount the treating physician's report where it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by the physician's own record or other objective medical evidence. Id.; see also Green v. Social Sec. Admin., 223 Fed. Appx. 915, 922-23 (11th Cir. 2007) (unpublished) (ALJ had good cause to devalue a treating physician's opinion where it was inconsistent with the objective medical evidence, as well as plaintiff's testimony). "When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the: (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence and explanation supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the pertinent medical issues; and (6) other factors that tend to support or contradict the opinion." Weekley v. Commissioner of Soc. Sec., 486 Fed. Appx. 806, 808 (11th Cir. 2012) (unpublished) (citing 20 C.F.R. § 404.1527(c)). When an ALJ articulates specific reasons for declining to give a treating physician's opinion controlling weight, and the reasons are supported by substantial evidence, there is no reversible error. See Forrester v. Commissioner of Social Sec., 455 Fed. Appx. 899, 902 (11th Cir. 2012) (unpublished) ("We have held that an ALJ does not need to give a treating physician's opinion considerable weight if evidence of the claimant's daily activities contradict the opinion."). Indeed, an ALJ "may reject any medical opinion, if the evidence supports a contrary finding." Id. at 901. Although the ALJ must evaluate the treating physician's opinion "in light of the other evidence presented," "the ultimate determination of

disability is reserved for the ALJ." Green, 223 Fed. Appx. at 923 (citing 20 C.F.R. §§ 404.1513, 404.1527, 404.1545).

As noted supra, Dr. Perry opined that Plaintiff's pain results in "extensive diminution" of his capacity to carry out specific activities of daily living and requires frequent use of narcotic medication and possibly invasive procedures. He further opined that physical activity increases Plaintiff's pain to the extent that medication or bed rest is necessary, that his medication impacts his work ability to the extent that his effectiveness is severely limited in the work place due to distraction, inattention, and drowsiness, and that his ability to lift and carry is "negligible". (id. at 291-92) A review of the record demonstrates that Dr. Perry's opinions are inconsistent with the record as a whole, with Dr. Perry's own treatment records, and with Dr. Perry's own opinions. In the same disability forms, Dr. Perry opined that, despite Plaintiff's impairments, he can sit for three hours at one time for a total of more than six hours a day, that he can perform "sustained work activity" for eight hours a day if sitting, that he can continuously reach overhead and push/pull with both arms, that he can continuously push/pull with both legs (including his injured right leg), and that he anticipates improvement in Plaintiff's condition. (Id. at 291-92). These latter opinions are clearly inconsistent with Dr. Perry's opinions related to the extensively limiting effects of Plaintiff's pain. Moreover, Dr. Perry's opinion that Plaintiff's ability to lift/carry is "negligible" is unsupported by any evidence in the record -- particularly given that Plaintiff does not have an upper extremity impairment of any kind -- and is inconsistent with Dr. Perry's opinion that Plaintiff can continuously reach overhead, handle, push, and pull with both arms. (Id. at 30, 292). Also, as discussed above, Dr. Perry's own treatment notes reflect continued healing of Plaintiff's right ankle in the year following his injury and good reports in physical therapy, and show that while Plaintiff still had pain in his ankle, it tended to be only

when he turned it "a certain way." (Id. at 286, 294-95, 298-99).  Indeed, Dr. Perry's treatment notes on the date that he completed the disability forms document that although Plaintiff had a "somewhat hesitant" gait, he had good range of motion in his ankle and even reported that he was "doing some work." (Id. at 296).  Dr. Perry opined that while Plaintiff may be prevented from heavy manual labor "at this point," he "can do sedentary activities" and "[i]n the future, . . . may be able to resume activities, which require more of a physical demand." (Id. at 296).  Finally, Dr. Perry's opinion that the side effects of Plaintiff's medication "severely limit[]" his effectiveness in the work place is inconsistent with Plaintiff's statements in his Disability Reports that he has *no* side effects from his medications.  (Id. at 180, 201, 291).  Thus, because Dr. Perry's opinions in the Physical Capacities Evaluation and Clinical Assessment of Pain forms are inconsistent with his own treatment records, his own opinions, and Plaintiff's statements and testimony related to his activities of daily living, they were properly discredited by the ALJ and assigned "little weight." (Id. at 31).

After a careful review of the record, the undersigned finds that the ALJ's credibility finding is supported by substantial evidence and that her reasons for discrediting Plaintiff's testimony, as well as the opinions of Plaintiff's treating physician, Dr. Perry, related to the severity and limiting effects of Plaintiff's pain, were clearly articulated in the decision.  Based on the foregoing, the Court further finds that substantial evidence supports the ALJ's RFC determination that Plaintiff can perform a range of sedentary work.

As noted above, this Court may not decide the facts anew, reweigh the evidence, or substitute its judgment but must accept the factual findings of the Commissioner where they are supported by substantial evidence and based upon the proper legal standards.  See Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987) ("the findings and decision of the Secretary are

conclusive if supported by substantial evidence."); accord Hand, 761 F.2d at 1549. Therefore, Plaintiff's claim that the ALJ erred in failing to properly evaluate his testimony with regard to the severity of his pain and in failing to consider all of the evidence of record is without merit.

### c. Whether the ALJ erred in failing to properly consider all the claimant's impairments and resulting limitations in posing a hypothetical to the Vocational Expert?

Finally, Plaintiff argues that the ALJ erred in failing to include Dr. Perry's limitations in the hypothetical that she posed to the VE and in failing to consider the VE's testimony related to the hypothetical that Plaintiff's counsel posed, which asked the VE to assume as true the impairments and limitations set forth by Dr. Perry in the April 2010 Physical Capacities Evaluation and the Clinical Assessment of Pain forms. (Doc. 13 at 15-18; Tr. at 77-79). Plaintiff argues that when the VE was asked to include in the hypothetical all of the limitations expressed by Dr. Perry (i.e., that Plaintiff's ability to lift/carry is "negligible," that Plaintiff has an extensive diminution in his ability to carry out activities of daily living, that physical activity increases Plaintiff's pain intensity to the extent that medication or bed rest are necessary, and that the side effects of Plaintiff's medications would be severely limiting in the work place), the VE testified that there would be would be no jobs in the national economy that Plaintiff can perform. (Id.). While Plaintiff's characterization of the VE's testimony is correct, his argument is misplaced.

Having already determined, for the reasons set forth above with respect to Issue Two, that the ALJ properly discredited Dr. Perry's opinions expressed in the April 2010 Physical Capacities Evaluation and Clinical Assessment of Pain forms, the ALJ did not err in failing to pose her own hypothetical to the VE using Dr. Perry's non-credible limitations, nor did the ALJ err in failing to consider the VE's testimony that assumed those flawed opinions as true.

Therefore, Plaintiff's claim is without merit.

## V.     Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **20th** day of **March, 2013.**

                                        /s/  **SONJA F. BIVINS**
                        **UNITED STATES MAGISTRATE JUDGE**